and others. And first, Mr. Goblat. Thank you, Your Honor, and may it please the Court that Craig Goldblatt on behalf of the Comcast entities. Comcast made a $100 million secured loan to the debtor. The collateral securing that loan included the affiliation agreement that is the subject of this appeal. In its plan of reorganization, the debtor chose to keep that collateral. Indeed, the bankruptcy court made a factual finding that its business could not succeed without that asset. The court nevertheless concluded that the affiliation agreement had inconsequential value. That was wrong for three separate reasons, each of which independently requires reversal. First, in the business reorganization context, every court to have considered the issue, save for the courts below, has concluded that the value of the collateral is determined as of the effective date of the plan, not as of the petition date. Second, it was wrong to subtract from the value of the collateral costs that were never borne by the estate. And third, even if the cost should be subtracted, it was error to allocate all of those costs to the value of Comcast's collateral as opposed to allocating them ratably across the various assets. So starting with the first of the three issues, the decision to value the collateral as of the petition date rather than the effective date cannot be squared with the language of Section 506A1 of the Bankruptcy Code. The plain language of that provision is controlling, and it says that the value of collateral shall be determined in light of the purpose of the valuation and the proposed disposition or use of the property. Here, the purpose of the valuation was Comcast treatment under a confirmed plan, and the proposed disposition or use was the use by the reorganized debtor, a business that would not come into existence until the effective date of the plan. It therefore necessarily follows that the relevant date of that valuation must be the effective date of the plan. Critically, there is not a single decision in a case involving a business reorganization that would value the collateral as of the petition date, and for that reason, the judgment below cannot be affirmed. Does it matter? This is a Chapter 11 case, and the other cases that I think you're relying on weren't Chapter 11 cases. Does that make a difference? It does, Judge Prado. Our point is that in the Chapter 11 business reorganization case, every decision to have addressed the issue uses the effective date. The decision on which the court below and on which the other side relies is primarily a Chapter 13 case, the one that was, as Your Honor suggests, a Chapter 13 case. But the decision itself in its context reflects the principle that the Bankruptcy Code entitles secured creditors to the benefits of appreciation, but also protects them from the risks of depreciation, because as this Court has long recognized, including in the Pacific Lumber decision, the structural protections that the Bankruptcy Code affords secured creditors themselves reflect the underlying constitutional concern about the secured creditor's property interest in its collateral. Now, Judge Prado, further to your point, after this Court's decision in Stembridge, a subsequent congressional enactment I think quite clearly drew the distinction between the Chapter 13 context and the Chapter Section 506A2 of the Bankruptcy Code. And what that section says is that in an individual case, in a case under Chapter 7 or 13 where you have personal property, and that is property that almost by definition is depreciating rather than the appreciating assets at issue here, the court said, the Congress said that the petition date should be used. And that makes sense in the context. And so what Congress essentially did is it took this Court's decision in Stembridge and it codified it, but it essentially cabined it to the context in which it arose, the individual consumer Chapter 13 case. At the time Section 506A2 was enacted, there were already two Courts of Appeals decisions, the Third Circuit decision in Heritage Holding and the Eighth Circuit decision in Ahlers, as well as both of the leading treatises on reorganization context, the effective date is the date to use. And then this Court said in Stembridge in a case involving an individual consumer's truck in a Chapter 13, in that context used the effective date. And because Congress is presumed to be aware of the law at the time it legislates, its decision to announce that the petition date should be used in the individual consumer context, but to say nothing further about the Chapter 11 business reorganization context where the law uniformly provided that the effective date was the date to be used, is best read to essentially codify the law as it then existed, which is that the effective date is the date that applies in the business reorganization context. The principle reflects the longstanding notion in Chapter 11 dating back to Judge Hill's decision in Mural Holding that the bankruptcy code seeks to give the secured creditor the benefit of the non-bankruptcy bargain. What Mural Holding says is that a secured creditor is entitled to its money or at least its property. And the point is that a debtor can choose to keep the secured creditor's asset. They can choose, despite the secured creditor's property interest in its collateral, to keep it. That's the debtor's choice. But when the debtor makes that choice, the consequence of that decision is that it's required to pay the secured creditor's debt in full. And that point is reflected through a series of statutory provisions that create a construct in the bankruptcy code, all intended to reflect that fundamental principle that this Court explained in Pacific Lumber has constitutional underpinnings. And the decision below does violence to that fundamental principle, which is quite critical to the structure of the bankruptcy code. Even apart from the date on which the collateral is valued, so turning to the second of the three points, the bankruptcy court erred in subtracting from the value of the collateral. I assume that Judge Iskar has had a number of Chapter 11s before. Is this the first time he's ever chosen the petition date as opposed to the... So I'm not aware of any other decision of Judge Iskar. Judge Iskar is a very capable bankruptcy judge. I'm not aware of any other decision in which he's chosen the petition date. He certainly didn't cite to any. And for what it's worth, notwithstanding this Court's decision in Stembridge, in the business reorganization context, lower courts in the Southern District, there's a decision out of the Eastern District of Texas called In Ray Good. Nothing out of the Southern District? I'm not aware of anything in the Southern District. But I am not aware, and it's not just another opinion of Judge Iskar's, I'm not aware of any other decision in the business reorganization context anywhere. Certainly the other side doesn't point to one that in the business reorganization context used the petition date for valuing the secured creditor's collateral. This case is literally unprecedented. Do other cases in the Southern District where they talk about using the effective date of the plan and why? So here's the basic rationale, Judge Owen, that upon the petition date... I'm just asking, are there cases out of the Southern District or not? I'm just asking. Oh, out of the Southern District? I'm not aware of any. There is a, the In Ray Good case out of the Eastern District contains an extensive discussion of the point. I'm not aware of a Southern District case. This is, just to be clear though, the Third Circuit in Heritage Holding and the Eighth Circuit in Ahlers squarely hold that the effective date is the applicable date. So this, the decision below cannot be affirmed without creating a circuit split. And that would be quite unwarranted because of this court's long body of precedent that reflects and respects the secured creditor's bargain and accounts for its underlying constitutional moorings. So those can't be, those cases can't be distinguished? There would be a circuit? The other side has not suggested that those cases can be distinguished. I think the decision below cannot be affirmed without breaking from the Third and Eighth Circuits that say squarely that the effective date is the date on which you value a secured creditor's collateral. So that, and that reason is in and of itself a sufficient basis to reverse. There are two other reasons that both provide bases for reversal that are even independent of that reason. The, the issue of No, no, just Yes, I'm sorry. No, dollar-wise, if we just ruled in your favor on issue one, how many, what dollar value? So, so Your Honor, the answer is if this court reverses for any reason, the only consequence is that the teams are then required to pay Comcast its secured claim in full, and that would require the teams essentially to pay Comcast approximately $75 million or so, give or take. The reason is, as long as you value the collateral as being consequential as opposed to inconsequential, Comcast is entitled to exercise its rights under Section 1111B of the Bankruptcy Code, which is one of the structural protections we discuss. If Comcast can make that election, it is entitled to be treated as fully secured and therefore paid in full, which reflects the Mural Holdings point. And if the lower court decision is reversed on any of the three bases we describe, the result is that the collateral has consequential value regardless of exactly what it's worth, it becomes consequential, and therefore Comcast can make the 1111B election, and therefore it's entitled to be paid in full, giving Comcast, if not its property, then at least its money, as Judge Hand explained. Turning then, if I may, to the second of the three points, the costs that were at issue here were costs that were borne by the teams. They weren't borne by the estate. And it is simply incorrect and illogical to deduct from the value of collateral costs that will not be incurred. And in this regard, the decision reflects what is in substance, in economic value. And the Supreme Court's decision in Hartford Underwriters is in this respect really quite instructive. The issue in Hartford Underwriters was, just as it is here, an unsecured creditor provided services to the debtor. In Hartford Underwriters, it was actually workers' compensation insurance that the debtor needed in order to operate its business after the petition date. It wasn't paid, and it said, we'd like to surcharge the collateral. And the Supreme Court has said expressly when collateral can be surcharged on account of someone's expenditures. And it's limited to cases in which the trustee spends money for the purpose of preserving or enhancing the value of that collateral. If a third party pays money or provides services, that's not a basis for a surcharge. And the argument that was made in that case is very clear. When you offer these services, it operated in effect to enhance the value of your collateral, and that gives you a windfall, and it's wrong to give you that benefit. And the Supreme Court essentially said two things in response. First, it's not inappropriate that reorganization cases create value all the time, but the manner in which that value gets allocated follows the structure of the Bankruptcy Code, and secured creditors come ahead of unsecured creditors. And second, to the extent one believes that as a matter of policy, that's not the appropriate decision, that's an interesting point, but one that should be raised to Congress, because there is no question that the language of this Bankruptcy Code as it is written requires that result. And in this case, that is exactly what happened here, and the other side's argument that it somehow would provide a windfall for the secured creditor to get paid in full before value goes to other creditors simply runs afoul of that principle. At the end of the day, the critical point in this regard is this asset was the critical asset. The teams chose to keep the asset, and they chose to reorganize around it. They could have made a different decision and liquidated the company and taken their rights and gone away, but they chose to keep it. And the reason they chose to keep it, as the Bankruptcy Court found, is that without this asset, which would generate a half a billion dollars of present value, the network could not succeed. And against that factual backdrop, the story that that very asset has only inconsequential value simply doesn't add up. So for those reasons, we think the decision below needs to be reversed. I'd like to reserve the balance. Thank you, Your Honor. Mr. O'Quinn. Thank you, Judge Prado. May it please the Court, John O'Quinn, on behalf of the Astros and the Rockets. I want to respond first to a point that my colleague made, because I think it's not quite accurate. He suggested that if the Court were to adopt an approach that doesn't use the effective date, that that would create a circuit split. In fact, the opposite is true. If you were to adopt a per se effective date approach, that would be absolutely inconsistent with the Third Circuit's decision in Heritage Highgate. And I'll read to you the seventh footnote of that opinion, which says, quote, like the appropriate measure of fair market value, the appropriate time as of which to value collateral may differ depending on the facts presented. As with the replacement valuation technique, bankruptcy courts are best situated to determine when is the appropriate time to value collateral in the first instance. We, therefore, defer to their considered judgment. That is exactly what this Court should do here. The issue here is a fact-intensive one. Based on the facts and circumstances and the equities, the bankruptcy court, which heard all this, made a determination that the petition date was appropriate, that is consistent with this Stembridge, the textual analysis would be exactly the same, and it is certainly permitted under this Court's decision in T.H. New Orleans. But I think it would be helpful just to take a step back and look at what is really going on in this case, because it's not really about valuation dates. Even their own cases don't make the date turn on things that happen in bankruptcy. They talk about dates that are close in time. What's going on here? What they're trying to do is to have the costs associated with its contract not attributed to that contract. It wants to have the contract valued solely based on the revenue that it generated, but at the same time ignore the undisputed costs for the media rights that are integral to the contract itself, because this is an unusual asset. It's a contract that's being valued, but it's a contract that entirely depends on having the media rights. If you don't have media rights, you don't have content. If you don't have content, then you can't generate revenue. And so the bankruptcy court recognized that economic reality. What Comcast wants is to have its cake and eat it too. It advocates for a per se effective date rule as a proxy to avoid the costs that were associated with the media rights. It wants to use the effective date not because that better represents market conditions. This isn't a piece of property where the value changes from one day to the next based on market fluctuation. It wants to use the effective date because that's when the team's forgiveness of their right to immediate payment took place. It wants to use that forgiveness against the teams to say, aha, look, our otherwise valueless contract has value because you didn't insist on being paid. Instead, you compromised your claim in order to help make a restructuring take place. Now, to adopt Comcast's approach would have significant ramifications for future restructurings. It would discourage parties from compromising their claims. It would unquestionably lead to more liquidations. And that's exactly what happened here. The Bankruptcy Court made express findings that Comcast, quote, and this is at RE-176, either wanted to acquire the company on its own terms or to have a failed company, end quote. That's the opposite of what the Bankruptcy Code is designed to encourage. And indeed, the Bankruptcy Court put, made it clear that Comcast was motivated out of an anti-competitive motivation. That's at RE-172, 176, 188, where the Bankruptcy Court discusses this. And that if Comcast was acting in its interest as a lender, Comcast would have, of course, agreed to the restructuring because it came out $10 million ahead of where it would have otherwise come out. So Comcast wants to use the team's forgiveness against them and to ignore the costs that are actually associated with the contract. And the Bankruptcy Court recognized you can't do that. This was not a gift to Comcast. These were actual costs actually incurred by the network on its balance sheet. You can find them reflected in the monthly operating reports, for example, at Bankruptcy Court docket number 399, at docket entry number 900. These are actual costs. And the teams agreed to forgive those costs just to enable reorganization and prevent a liquidation. And so the real issue in this case is whether Comcast can take for itself the benefit of the value contributed by the teams when they waive their right to be paid the media fees that were undisputably necessary to the contract. Valuation by the bankruptcy judge, I gather, is a mixed question of fact and law. So what is the standard of review and what are we looking at under different standards? Is there some law here? Is there some facts here? What is what and how does an appellate court review the bankruptcy judge's ruling? Absolutely, Judge Prado. So valuation, this Court has recognized valuation as often just turns on a question of fact. It can ultimately be a mixed question of fact and law. I think the questions that are principally presented here are questions of fact. They are questions of whether or not the bankruptcy court used a permissible technique. And as this Court recognized in T.H. New Orleans, quote, the bankruptcy code leaves valuation questions to judges on a case-by-case basis. That's at page 799. And the Heritage Highgate case, which my colleague cited, says, quote, in the 506A context, Congress envisioned a flexible approach to valuation whereby bankruptcy courts would choose a standard that best fits the case. And that's at page 141 of that opinion. And so I think that the case law recognizes the bankruptcy courts have to have a significant amount of deference in determining what an appropriate valuation technique is, and— Why isn't that a question of law? Well, Judge Weiner, I think that the Supreme Court itself in footnote 6 of the Rash opinion said that the valuation method is going to depend on, quote, the nature of the property. And so the Supreme Court recognized that there are going to be fact questions. And that's what's going on here. In terms of the consideration of the cost, you had a battle of the experts. You had two experts that used the exact same technique, a discounted cash flow analysis. And the only difference between those experts was when the valuation was to begin. Was it to begin at the petition date, or was it to begin as of the effective date? I think under this Court's— Which date to begin with seems to me to be a question of law. Once you get that date, then it gets into fact. So Judge Weiner, I think there are two things going on here. One, if the question is do you have a per se effective date, do you always have to use the effective date, which is the I would also submit no court, not a single court, holds that you always have to use the effective date. And this court in T.H. New Orleans actually held that that is a question for a court to decide in its equitable discretion. I think this Court's decision in Stembridge—and to be sure, Stembridge is a Chapter 13 case. But the textual analysis that this Court undertook in Stembridge is not materially different from the textual analysis that you would undertake here. And in fact, other courts like the River Village Associates Court have recognized that the present value language in 1129 and in 1135 are virtually identical, virtually identical. And so I think the textual analysis that this Court did in Stembridge equally applies here and demonstrates why you would have a presumption, a default rule, that it should be the petition date. The petition date, of course, is the watershed event in a bankruptcy proceeding. It is—it is—it avoids rendering the second part of the clause that would be at issue in 1129 redundant, which is what this Court found would have been the case under 1135 if it had used the effective date. It also prevents gamesmanship from manipulating dates or from distortions that are created by bankruptcy itself. And I think that's an important point here. It's well-settled. The United States Supreme Court in Butner v.— You're saying that he had discretion to pick between the effective date of the plan and the filing date. Judge Owen, I'm saying that applying the logic of this Court's decision in Stembridge, that the— You're just saying there's no per se rule. I'm saying there is no per se rule that's the effective date— And the discretion of the bankruptcy court to decide based on the facts of the case which to pick. I—I'm saying all of that, and I'm also saying that Stembridge creates a presumption that you should pick the petition date, but that at any minimum the bankruptcy court has the discretion to pick the date based on the facts and circumstances of the case, which is exactly what the Heritage Highgate case says, contrary to what counsel represented in footnote 7 of that opinion. And so here the bankruptcy court used its discretion, picked the petition date in order to reflect economic reality. And that's not all the bankruptcy court did, because what the bankruptcy court also did, in addition to using the discounted cash flow analysis that the parties had discussed, the bankruptcy court also did an alternative analysis of replacement value. And the bankruptcy court determined that this was a market rate contract. And in other words, there are no costs—there's no intrinsic value to the contract because you could go out and replace it at market rates. And that's supported in the record. And I know the court has pulled the record. If you go and look at the October 7, 2014 transcript, and you look at pages 83 to 87, you have Comcast's own witness conceding that they would have to carry the network. You have Comcast experts and witnesses agreeing that the rate that was in the AT&T, the DirecTV, and the Comcast rate would be the same rate that other carriers would use, and that's at page 36 of the October 7, 2014 transcript talking about DISH Network. And you can also see the same point reflected at page 336 of that transcript. And so you have the bankruptcy court doing two things. Number one, confirming that under the discounted cash flow analysis model, a model that both sides' experts used, that the value of the contract was of insubstantial value. And that doesn't mean that it's not going to throw off a lot of revenue. It is, but the bankruptcy court said it best when he said that revenue does not profit make. And when you did the net present value analysis of whether or not that contract over its life would return a profit, the answer was no. But the second analysis that the bankruptcy court did, which was a separate part of that, and which does not depend on the date, doesn't depend on petition date, doesn't depend on the effective date, is the replacement cost analysis. And again, the bankruptcy court made the factual findings that it was a market rate contract. Also in the October 7 transcript, or it may have been the October 8 transcript, the bankruptcy court recognized that the contract included a most favored nation clause, which necessarily meant that it was a market rate contract. It would automatically drop to whatever the market rate was. And the point is, if you have a market rate contract, then it doesn't have intrinsic value because if you went out on the market, then these are the terms that you would enter into. Now, I predict that Comcast counsel is going to come up and is going to say, well, if that's all true, then why did the teams keep the contract? Why didn't you just reject the contract? Why didn't you just go for a liquidation? And that point is answered by the bankruptcy court as well. The bankruptcy court identified at RE-192, quote, the frictional costs of negotiating a new contract with Comcast. And those are particularly heightened here. And the reason they are is because Comcast, of course, a party in which the teams had just now had this acrimonious bankruptcy relationship with, Comcast, as the bankruptcy court found, was not acting in its interests as a creditor, was acting instead for anti-competitive reasons. And so the notion that the teams are supposed to then go out and then immediately renegotiate a contract with a party that has just been in an acrimonious bankruptcy with, that has acted, as the bankruptcy court found on the facts, in an anti-competitive manner, no, of course the teams didn't want to have to go through renegotiating the contract. But those aren't, that doesn't go to what the value of the contract is. What about their third argument? He listed three things today, and one was he said the heirs should not, I mean, it should not have all been allocated to Comcast. Sure. So two responses to that. First, on the law, that is exactly the quintessential type of question that is for a bankruptcy court in the first instance. Again, if you look at the Heritage Highgate case at 141, bankruptcy courts have determined value on a case-by-case basis, taking into account the facts of the case and the competing interests in the case. That determination, again, resolving a battle of the experts, quintessentially a question that would be reviewed for clear error. Second, there was no error. The bankruptcy court walked through meticulously why it was allocating on a year-by-year basis and used the model that both experts endorsed. And again, you can see this, all the experts agreed to a discounted cash flow model, that's the bankruptcy court's opinion, and they all agreed that when you do a discounted cash flow analysis, you take revenue minus cost on a year-by-year basis, and that's at RE 200 to 201. And the bankruptcy court did just that. And going back to the petition date, the only asset that was generating revenue was the Comcast affiliation agreement, and that is why the bankruptcy court allocated the costs incurred during that year solely to the Comcast affiliation agreement. Now, it allocated it to the other agreements going forward, but in the year in which the Comcast affiliation agreement was the only agreement, that is why the bankruptcy court, using the exact methodology that Comcast's own expert used, he just didn't want to go back and do it as to the petition date. And again, that's what this is about. The reason that they are arguing strenuously against a petition date and arguing for an effective date is they want to essentially blot out, to ignore the media rights fees that would have had to have been paid from the petition date, post-petition, through the effective date. That is antithetical to the basic notions of equity that undergird bankruptcy law. It is inconsistent with what the bankruptcy code requires, and it would literally grant Comcast a windfall based on the happenstance of bankruptcy, which is exactly what Butner v. United States 440 U.S. 48 says that you can't do. And that's because, let's look at what would have happened outside bankruptcy. In the but-for bankruptcy world, one of two things would have happened. Either the teams would have been paid, and the contract would have been, therefore, underwater because costs exceeded revenue, or the contract would have been terminated. And in fact, that's what the Astros had attempted to do, and that is why Comcast engineered this involuntary bankruptcy Comcast forced the network into bankruptcy. This isn't a situation where you have a debtor that is in a voluntary bankruptcy. This is Comcast engineering an involuntary bankruptcy. And during that involuntary bankruptcy, Comcast got the benefit of the team's media rights being provided because Comcast continued to air the network. And in fact, Comcast was exclusively the party that aired the network. No other party was airing the network during that period of time. So Comcast got the benefit. Meanwhile, what did the teams get? Well, in order to do a reorganization, the teams made tremendous sacrifices here. In addition to being willing to give up these media rights costs that were incurred post-petition, media rights fees that they had an absolute priority right to be paid for in cash on the effective date where otherwise the network could not have emerged from bankruptcy. They gave up their equity in the network. They gave up a certain amount of their media rights going forward. And yes, they're indemnifying here. What happens if there's a remand and Comcast were ultimately to prevail, Comcast would be extracting even more value out of the teams in addition to what the teams have already provided. Now, my colleague says that, well, this is tantamount to a surcharge. You know it's not for a couple of reasons. Number one, the teams weren't paid. If this was a surcharge, the teams would have had to have been paid. Second, the bankruptcy court made specific findings about why this was not a surcharge and actually specifically noted that if this had been a surcharge, that there would have been a mathematical difference of about $10 million. And that's RE-1190. So it's certainly not a surcharge situation. Indeed, if it was a surcharge, then all of the assets that Comcast got, the cash, the accounts receivable, all of which was made possible only because the media rights continued to be provided, those would have been surcharged too. They weren't. This was instead a valuation technique using discounted cash flow analysis model that both sides' experts agreed was appropriate. And in addition, you have the bankruptcy court separately and independently making an assessment of replacement cost value. And that leads to the following point. Comcast suggests that, well, if you were to agree with it, you should simply just reverse and be done. We think that you should affirm. We think you can affirm on any number of the bases that I've articulated. But if you were to agree with Comcast and create a circuit split with respect to creating a per se effective date rule or something like that, at most you should remand. And the reason for that is because, number one, you have the competing methodologies that the bankruptcy court used, including its, and I see my time is up. If I may just finish the thought, Judge Prado. The bankruptcy court had its replacement value methodology. So at a minimum, you should remand for it to be able to consider in light of that. Number two, there were a number of assumptions in the valuations that were used under the discounted cash flow analysis that would have changed. And number three, they don't have an allowed claim. There's a litigation trust that's pursuing claims against them. They don't have an allowed claim. So at most, if the court were to disagree with us, and we don't think you should, you should just affirm, at most that would require a remand for further consideration by the bankruptcy court. Obviously, if the panel has questions, I'm happy to entertain those. And Judge Prado, I would always be happy to take on a pro bono representation from this court. So thank you. In the mail. Absolutely. I look forward to it. If there are no questions, thank you very much. Thank you. May it please the Court, I think I have basically four points to make by way of rebuttal. First, Mr. O'Quinn described the heritage holding case as suggesting there's discretion in Let me explain that. There are some cases, including this court's decision in TH New Orleans, that say choosing the right time depends on the purpose for the valuation. And the language that Mr. O'Quinn cited from heritage holding is of the same point, that in certain circumstances there's discretion. But here's the real point that Mr. O'Quinn omitted, which is in the context of deciding the treatment of a secured creditor's claim under a plan, there the court goes on and articulates a legal rule. And if I can just read the sentence from the Third Circuit, it says, whereas here the purpose of the valuation is to determine the treatment of a claim by a plan, the values determined at the Section 506a hearing must be compatible, must be compatible with the values that will prevail on the confirmation date. Similarly, the Eighth Circuit in Ahlers made unmistakably clear that in this context, which is exactly the context the Court has here, quote, for purposes of the plan, the value of the collateral is to be determined at the time for confirmation of that plan. So whatever discretion there is in different circumstances to set an appropriate methodology in light of those contexts, which is what T.H. New Orleans is about, in this context, this specific context was addressed directly by the Third Circuit and the Eighth Circuit, and they said squarely it must be the effective date. The second point, you know, Mr. O'Quinn described the principle that what he argues is that essentially what Comcast was trying to do was engage in anti-competitive conduct and cause the liquidation of the debtor. Those assertions are simply incorrect. The fundamental way the Court should appreciate that is the consequence of reversal is simply that the teams will be required to pay our claim. This network is up and running. Reversing the decision below will not interfere with the functioning of the network. Section 7.12 of the plan makes clear the only consequence of reversal is that the teams, as they've agreed to, are required to pay on Comcast's claim. So there is no question about running a competitor out of business. There is no question about interfering with the reorganization. This is simply a question of whether the teams are required to pay our claims. Third, if I can just address what Mr. O'Quinn said about replacement value, and this is, I think, quite beside the point, but he made this long argument that even though it wasn't a finding, that the decision could nevertheless be affirmed on the theory that the valuation was justifiable on replacement value. Here's the critical sentence from the record that Judge Isger said on that point, and this is in the record excerpt at page 191. He says, I don't have any evidence to support my gut about all of that. So in addressing the question about replacement value, he noted that both parties used a discounted cash flow analysis. He said it was a permissible way to do it. He based his valuation on that methodology. He mused about the possibility that maybe there was another way to do it, and what he said is, I don't have any evidence to support that. What about the allocation thing? So the allocation point is an additional critical point. So here's what happened, Judge Owen. So the teams incurred these expenses during the bankruptcy case. They provided media rights. They weren't paid for it. The reorganized debtor never paid for any of it, and the debtor in possession never paid for any of it. They were borne by the teams, and under the plan, the teams agreed to waive them. The bankruptcy court decided it was going to impose those costs on the value of the collateral, saying, well, look, had this not happened, the collateral would have been worthless, a point that was true also in Hartford Underwriters. If he was right that, and he's not, that it was appropriate to essentially tax the collateral for the costs that were borne in order for that collateral to have value, it follows just as a matter of logic that those costs should be divided among the different parts of the collateral, all of which would have been worthless, but for that decision, and the bankruptcy court in that regard said quite clearly if he was wrong to charge it all to collateral, he said candidly and correctly that he was wrong and his decision should be reversed. He said that on page 202 of the record excerpts. The critical point in this regard is that these costs were not borne by the estate. They were borne by the teams. They were borne by the teams because they made the decision that they wanted to keep this collateral, and the submission is that they should be required to bear the consequences of that decision, which is that the secured creditor is therefore to be entitled to be paid in full on its allowed secured claim. So is there enough in the record for us, except in your argument, to render or does this require a remand for the bankruptcy court to reevaluate? I don't believe there is anything left to do. I think that section 7.12 of the plan makes clear that if this, if the judgment is affirmed, I'm sorry, if the judgment is reversed, we are permitted to make the 1111B election and therefore have an allowed secured claim, and the plan expressly contemplates that possibility and says what happens. So we don't think there's anything left that needs to occur. The argument that Mr. Arquin makes essentially that they want a do-over to make a different argument, having fully tried the case, to make a different argument on which the bankruptcy court, after they tried it once, said there was insufficient evidence to support their, that conclusion, we don't think provides a basis essentially to get a do-over. So we think the decision is, the proper result is that the decision should be reversed. Is that responsive, Judge Prado? Yes. So for those reasons, we think the proper decision is to reverse the decision below. Thank you, Your Honor. Thank you.